## Carpenter, et al. v. Dummit.

(Decided June 24, 1927.)

### Appeal from Clark Circuit Court.

1. Agriculture.—Provision in articles of incorporation or bylaws of warehousing corporation, organized as necessary part of co-operative marketing association, providing that common capital stock shall be issued only to members of association, held valid under Bingham Co-operative Marketing Act (Acts 1922, c. 1), section 7(a), in view of sections 6(d), 14, 23.
2. Liens.—One who parted with valuable consideration for stock in warehousing corporation which could not be delivered to him because he was not member of co-operative marketing association of which warehousing corporation formed a necessary part, held entitled to lien on stock for amount paid, notwithstanding general rule that there is no implied lien on personal property in favor of one advancing money for it without having title or possession.
3. Assignments.—Assignment by tobacco grower of "all proceeds" of crop held to include common stock in warehousing corporation forming a part of co-operative marketing association, substituted for proceeds, amounts set aside as dividends thereon, and unused portion of one per cent. of proceeds deducted for commercial purposes, since "proceeds" included everything that was or might be due from tobacco or sale thereof.
4. Words and Phrases.—To "pay" means to discharge a debt in money, goods, or other things of value.
5. Corporations.—Where dividend is declared and credited on books of corporation to stockholder, relation between corporation and stockholder is that of debtor and creditor, and assignment of stock does not pass dividends that have been declared.

ROBERT H. HAYS, BROWNING & REED and AARON SAPIRO for appellants.

NICHOLS, McCARTHY & DUMMIT for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming in part and reversing in part.

O. O. Carpenter, a member of the Burley Tobacco Growers' Co-operative Association, delivered tobacco to the association in 1923 and 1925. Carpenter received advance payments on the deliveries of these crops, and he was given participation certificates by the association showing the amounts of tobacco delivered and the different grades to which it belonged. On April 11, 1927, Carpenter executed an assignment of his interest in the 1923 crop to Eldon S. Dummit, who is not a member of

the association. By this assignment he authorized the Burley Tobacco Growers' Co-operative Association "to pay over to Eldon S. Dummit all proceeds, including all common stock or any proceeds which may hereafter be due or payable to me from this association out of tobacco of the 1923 crop delivered by me to your association, and any and all payments made to my said assignee or his receipt therefor will completely release you from any and all obligations to me for such amounts." On the same day he executed the following additional assignment:

> "For value received and receipt of which is hereby acknowledged, I, the undersigned, hereby sell, assign and transfer to Eldon S. Dummit the following described property, warehouse certificates as follows including all common stock. . . . and all the rights, title, and interest therein of the undersigned, and all the rights and privileges connected therewith which has or may flow therefrom."

The warehouse certificates were set out and described by number in the assignment. On April 12, 1927, Carpenter executed to Dummit an assignment of all his proceeds in the 1925 crop. By this assignment he authorized the association "to pay over to Eldon S. Dummit all proceeds or any proceeds which may hereafter be due or payable to me from the association out of tobacco of the 1925 crop delivered by me to the association represented by participation certificates as follows: (Describing them by number): and any and all payments made to my said assignee or his receipt therefor will completely release you from any and all obligations to me for such amount." After Carpenter delivered the 1923 crop of tobacco to the association, and received an advance payment thereon, the association set aside $212.10 out of the proceeds therefrom for the purpose of retiring preferred stock of the warehousing corporation and paying the guaranteed 8 per cent dividend thereon, in lieu of which common stock of the corporation of the par value of $212.10 was to be issued to the grower, Carpenter. The association also deducted out of the proceeds 1 per cent thereof for general commercial purposes as allowed by its charter and by-laws. All of the amount realized by this 1 per cent deduction was not used for commercial purposes, and the unused portion must be paid by the association either to Carpenter or his as-

signee.  After all of Carpenter's tobacco shall have been
sold and the above deductions taken out, there will re-
main a surplus of the proceeds which will be due to Car-
penter, and it is conceded that under the assignment they
pass to Dummit.  The same deductions were made from
the proceeds of the 1925 crop of tobacco, except that the
amounts involved are different; $425.28 having been de-
ducted to retire preferred stock of the warehousing cor-
poration and pay the guaranteed dividend thereon.

This action was brought in the Clark circuit court
under the provisions of chapter 83 of the Acts of 1922,
being sections 639a-1—639a-12, Carroll's Civil Code of
Practice of Kentucky, 1927 edition, and known as the De-
claratory Judgment Act, for a declaration of the rights
of appellants and appellee under the assignments of Car-
penter to Dummit.

The lower court entered a judgment declaring the
rights of the parties to be: (1) That under the terms of
the assignment dated April 12, 1927, Dummit, the as-
signee, is not entitled to the stock, same being of the
value of $425.28, in the Central District Warehousing
Corporation purchased or to be purchased for the mem-
ber, O. O. Carpenter, by the Burley Tobacco Growers'
Co-operative Association by deductions from moneys de-
rived from the sale of tobaccos represented by the par-
ticipation certificates named in the assignment; (2) that
the assignee Dummit is entitled to all funds deducted
from the tobaccos represented by such participation cer-
tificates under the authority of clause 6 of the Burley
Tobacco Growers' Association Marketing Agreement,
known as the 1 per cent or commerical credit reserve,
and that it is the duty of the association to pay such pro
rata part of such fund, as may be payable to Carpenter
directly to Dummit; (3) that no right or interest passed
to the assignee Dummit in or to the $57.75 cash placed
by the association to the credit of the member Carpenter
on June 30, 1926, being earnings on sums theretofore de-
ducted to retire preferred stock, same not having passed
to the assignee under the terms of the assignment, and
that no right passed to guaranties or dividends payable
after June 30, 1926; (4) that under the terms of the as-
signment dated April 11, 1927, reading "all proceeds, in-
cluding all common stock," the stock of the Central Dis-
trict Warehousing Corporation properly issuable to the

member because of deductions made from the proceeds of tobacco represented by the participation certificates listed in such assignment, being $212.10 in value, passed to the assignee, Dummit, and that the association and warehousing corporation are under obligations to cause to be issued to Dummit a certificate of stock in the Central District Warehousing Corporation of the par value of $212.10; (5) that the $17.51 placed by the association to the credit of Carpenter on June 30, 1924, as dividend or guaranty on common stock representing prior deductions from prior deliveries for the period June 30, 1923, to June 30, 1924, would not pass to the assignee under the terms of the assignment, and that the dividends or guaranties placed to Carpenter's credit at the rate of 8 per cent per annum on the $212.10 par value common stock on June 30, 1925, and June 30, 1926, would not pass to the assignee Dummit, but that the dividend or guaranty of 8 per cent for the period 1926-1927 due upon such $212.10 of stock as of June 30, 1927, does and will pass to the assignee under the assignment of April 11, 1927, and that it is the duty of the association and the corporation to cause such guaranteed dividend of June 30, 1927, and all further dividends which may be declared after April 11, 1927, to be paid to the assignee, Dummit, so long as he owns such stock; (6) that all rights in the 1 per cent or commercial credit reserve deducted under clause 6 of the Burley Tobacco Growers' Co-operative Association Marketing Agreement from the proceeds of the tobacco represented by the assignment of April 11, 1927, passed to the assignee; (7) that the limitation in the articles of incorporation and the by-laws of the Central District Warehousing Corporation by which it is provided that common stock may be sold and issued only to members of the Burley Tobacco Growers' Co-operative Association is an invalid limitation on the right of the member Carpenter to alienate his stock and the assignee, Dummit, a nonmember of the association, is entitled to have a certificate for stock of the par value of $212.10 issued to him.

The appellee, Dummit, who was the defendant below, has appealed from so much of the judgment declaring the rights of the parties as is contained in paragraphs 1, 3 and 5 thereof, and the appellants, who were the plaintiffs below, have appealed from so much of the

judgment as is contained in paragraphs 2, 4, 6, and 7 thereof.

The Burley Tobacco Growers' Co-operative Association was organized under the provisions of chapter 1, Acts of 1922, now chapter 32, article 19, Carroll's Kentucky Statutes, 1926 edition, and known as the "Bingham 'Co-operative Marketing Act." The Bingham Act, sections 3, 4, provides that 20 or more persons engaged in the production of agricultural products may form a nonprofit association with or without capital stock for the purpose of engaging in any activity in connection with the marketing or selling of the agricultural products of its members or with the harvesting, preserving, drying, processing, canning, packing, grading, storing, handling, shipping, or utilization thereof. Section 7a of the act provides:

"Under the terms and conditions prescribed in the by-laws adopted by it, an association may admit as members, or issue common stock to, persons only engaged in the production of the agricultural products to be handled by or through the association, including the lessees and tenants of land used for the production of such products and any lessors and landlords who receive as rent all or part of the crop raised on the leased premises."

Section 14 of the act provides in part that:

"The by-laws shall prohibit the transfer of the common stock of the association to persons not engaged in the production of the agricultural products handled by the association; and such restrictions must be printed upon every certificate of stock subject thereto."

Section 23 of the act is in part as follows:

"An association may organize, form, operate, own, control, have an interest in, own stock of, or be a member of any other corporation or corporations, with or without capital stock, and engaged in preserving, drying, processing, canning, packing, storing, handling, shipping, utilizing, manufacturing, marketing or selling of the agricultural products handled by the association, or the by-products thereof."

And section 6 (d) of the act provides that an association incorporated thereunder shall have power—

"to purchase or otherwise acquire; and to hold, own, and exercise all rights of ownership in; and to sell, transfer or pledge, or guarantee the payment of dividends or interest on, or the retirement or redemption of, shares of the capital stock or bonds of any corporation or association engaged in any related activity or in the warehousing or handling or marketing of any of the products handled by the association."

The Burley Tobacco Growers' Co-operative Marketing Agreement, known as the Standard Association Marketing Agreement, was signed by all of the members of the association, including the appellant O. O. Carpenter. By section 16a of this agreement the association was authorized to cause a warehousing or other corporation to be organized for the purpose of leasing, purchasing, or constructing and operating warehouses, drying or curing plants, storehouses, or other places to handle, treat, process, or store any or all of the tobacco delivered by members of the association. The agreement further provided that such corporation, if organized, should have common capital stock and preferred capital stock in amounts estimated as sufficient for their purposes by the directors of the association, and that the authorized common stock should exceed in amount the authorized preferred stock; that the common stock should be sold only to members of the association at par, but no member should purchase originally or directly more than one share or enough to qualify as director. It is further provided in this agreement that the common stock of such corporation should have all the voting power, and that the preferred stock should be divided into five equal classes, all bearing 8 per cent cumulative dividends, and having similar preferences subject to retirement at the rate of one class or one-fifth thereof annually beginning in June, 1923. Section 16 (j) of the Standard Association Marketing Agreement provided that:

"As the preferred stock is retired the association will calculate the value of the contributions from each grower's tobacco toward such retirement and toward payment of dividends on the common and preferred stock; and the corporation will credit

and issue from time to time to each such member common stock in an equivalent amount at the book value thereof, as conclusively established by the directors of the corporation as soon as the aggregate deductions equal the book value of one or more shares.''

As authorized by the Standard Association Marketing Agreement and by the Bingham Act, the Burley Tobacco Growers' Co-operative Association organized the Central District Warehousing Corporation under the general corporation laws of the state, the amount of capital stock being fixed at $1,485,110, consisting of 11 shares of common stock of the par value of $10 per share, and 148,500 shares of preferred stock of the par value of $10 per share. The articles of incorporation not heretofore referred to, in so far as pertinent to this controversy, are as follows:

Article 4, section (b): ''The common capital stock shall be sold and issued only to members of the Burley Tobacco Growers' Co-operative Association heretofore incorporated under the laws of the State of Kentucky at par, and no member shall originally purchase more than one share thereof.''

Section (c): ''The common capital stock shall have all the voting power of the corporation.''

Section (d): ''Only eleven shares of the said common capital stock shall be authorized at this time, but the said common capital stock shall be increased from time to time in such amounts as will equal one class of preferred stock hereinafter mentioned, and the amount of money that may be required to pay the dividend on all outstanding stock at the time of retirement of any of the classes hereof, and the stockholders of this corporation, upon the redemption of each class of preferred capital stock, shall take the appropriate legal steps to decrease the preferred capital stock by such amount which, at par, is equivalent to the said class of retired preferred capital stock and a sum equal to the amount required for the payment of dividends of all outstanding stock.''

Section (e): ''The preferred capital stock shall be divided into five classes, A, B, C, D, and E, each class containing 32,900 shares of preferred stock.''

Section (f): "'The preferred capital stock may be sold or issued to any person, firm or corporation; and shall be divided in as nearly equal amounts of all classes as may be advisable or possible. The preferred capital stock shall have no voting power, except as required by law."

Section (g): "The preferred capital stock shall bear and receive a preferred dividend of 8 per cent per annum, before any dividends whatsoever may be declared or paid upon common capital stock. These dividends shall be cumulative; and if not paid in any one year, must be paid in full in the succeeding years before any dividends whatsoever are declared or paid upon the common capital stock."

Section (m): "As preferred capital stock is redeemed, the corporation shall create and issue common capital stock in an equivalent amount in consideration of the payment of funds for the redemption thereof and for the dividends thereon."

We have quoted at some length from the Bingham Act, the articles of incorporation of the warehousing company and the Standard Marketing Agreement, but all of the sections quoted have a bearing upon the questions hereinafter discussed.

The issues raised by the pleadings may be summarized as follows: (1) Conceding that the assignments include stock in the warehousing corporation, are they invalid for that purpose because the assignee is a non-member of the association, and therefore incapable of taking the stock? (2) Does the assignment by Carpenter, executed on April 11, 1927, of all proceeds of the 1923 crop, transfer his right to the common capital stock in the warehousing corporation? (3) Does this assignment carry the dividends placed to the member's account prior to its presentation to the association? (4) Does any right pass to the assignee under either assignment to any part of the 1 per cent of the proceeds from the sale of the tobacco deducted for commercial purposes?

Article 4, section (b), of the articles of incorporation of the warehousing corporation, heretofore quoted, provides that the common capital stock shall be sold and issued only to members of the association. This provision is in the by-laws in identical language. Whether a provision in the articles of incorporation or by-laws of a corporation restricting the alienation of stock therein

is valid is a question of first impression in this state, and one upon which the courts of other states have differed. Some courts hold such a provision invalid in the absence of statutory authority therefor as being in contravention of public policy, while other courts hold such a provision valid, though no statutory authority therefor exists, and all courts hold valid reasonable restrictions upon the sale and transfer of stock when there is statutory authority therefor. Longyear v. Hardman, 219 Mass. 405, 106 N. E. 1012, Ann. Cas. 1916D, 1200; Barrett v. King, 181 Mass. 476, 63 N. E. 935; Wright v. Iredell Telephone Co., 182 N. C. 308, 108 S. E. 744; Bloomingdale v. Bloomingdale, 107 Misc. Rep. 646, 177 N. Y. S. 873; Sterling Loan & Investment Co. v. Litel, 75 Colo. 34, 223 P. 753; Ireland v. Globe Milling & Reduction Co., 19 R. I. 180, 32 A. 921, 29 L. R. A. 429, 61 Am. St. Rep. 756; Healey v. Steele Center Creamery Association, 115 Minn. 451, 133 N. W. 69; Farmers' Mercantile & Supply Co. v. Laun, 146 Wis. 252, 131 N. W. 366; Nicholson v. Franklin Brewing Co., 82 Ohio St. 113, 91 N. E. 991, 137 Am. St. Rep. 764, 19 Ann. Cas. 699; and New England Trust Co. v. Abbott, 162 Mass. 148, 38 N. E. 432, 27 L. R. A. 271. In 6 Thompson on Corporations (3d Ed.), sec. 4156, it is said:

"The rule is well settled that a provision in the charter or articles of incorporation that no stockholder shall sell and transfer his stock either, without the consent of all other stockholders, or that he will first offer it to the stockholders or to the corporation before selling to other persons, is binding on persons who become owners of the stock. These provisions which really amount to agreements between the stockholders themselves, are not invalid as against public policy, nor do they amount to an improper restraint of the power of alienation. There seems to be no objection to a corporation reserving to existing members the right to choose their associates. Such a provision justifies the refusal of the corporation to transfer the stock."

Waiving the question whether the restriction in the articles of incorporation and by-laws of the Central District Warehousing Corporation would be valid, in the absence of statutory authority therefor, we are of the opinion that the Legislature has, by section 7a of the

Bingham Act, quoted supra, declared the public policy of the state as favoring such restrictions in the charters of co-operative marketing associations organized under that act or of corporations organized to carry out the purposes of such an association. By the terms of the act such associations may be organized with or without capital stock, and they may in turn organize other corporations with capital stock to carry out and perform certain necessary duties incident to the purposes of the associations. The organizers of the Burley Tobacco Growers' Co-operative Association elected to form an association without capital stock and to separately organize warehousing corporations, and the Standard Marketing Agreement entered into between the association and all of its members authorized such an arrangement. The purpose in limiting the stockholders or members of the association to growers of agricultural products to be handled by it, and in restricting the sale or issuance of the common stock of the warehousing corporation, to which the voting power was confined, to members of the association, is patent. The success of a co-operative marketing association such as the one here involved must depend upon the loyalty of its members and their interest in its success. To permit the sale of its stock to persons not interested in co-operative marketing, and possibly unfriendly thereto, would render it possible to defeat the very purpose which it was organized to accomplish. The control by unfriendly persons of an allied corporation performing necessary functions in carrying out the co-operative marketing plan might prove equally fatal. The provisions in the Standard Marketing Agreement and in the articles of incorporation and by-laws of the warehousing corporation restricting the sale and issuance of stock therein to members of the association were inserted for the purpose of avoiding such a contingency. In discussing the validity of a by-law of a co-operative corporation which limited in certain respects the right of stockholders to transfer their stock, the court, in Chaffee v. Farmers' Co-operative Elevator Co., 39 N. D. 585, 168 N. W. 616, said:

"If stock in co-operative corporations could be sold and transferred the same as corporate stock in ordinary business corporations, to any person whom the stockholder saw fit, then it would be possible for persons whose interests were antagonistic to the co-

operative association to become members therein, and thereby defeat the very purpose for which the corporation was formed. So, it seems not only proper, but necessary, in order that such corporations may continue and accomplish the purpose for which they are organized, to permit restrictions to be placed upon the right to transfer and own stock therein.''

The following excerpt from the opinion in the case of Baumohl v. Goldstein, 95 N. J. Eq. 597, 124 A. 118, is applicable to the facts in this case:

''It would seem that a condition such as the one under consideration should be distinctly favored by the policy of this state. The commonwealth is benefited by the prosperity and success of the persons domiciled within its borders, whether natural or corporate. Consequently, any effort to keep the stock, and more especially that class thereof in which the control of the destinies of the company are contained, within the hands of the active members of the corporation 'is a consummation devoutly to be wished.' If there is no illegality attached thereto it will re-result in quickening the activities of the shareholders in the success of the common venture.''

In Longyear v. Hardman, supra, the court said:

''The characteristics of associated stockholders may be important. Harmony of purpose and of business methods and ideals among stockholders may be a significant element in success. The insertion of the restriction upon the right of transfer of the shares of stock in the agreement of association, the initial act in the organization of the company upon which depends all that comes after, is a limitation upon the corporation. It becomes a part of its being and enters into each share of stock as a part of its essence. The corporation comes into existence with this inherent qualifying restraint. It is agreed to by all the original incorporators who in respect of determining the nature of the corporation speak for future stockholders. It must be approved by the commissioner of corporations as representative of the commonwealth before the charter can issue. A copy of it is a public record in the office of the sec-

retary of the commonwealth where it may be read by all who contemplate becoming stockholders. . . . The owners of stock in a corporation thus organized cannot complain of such a congenital characteristic. Each stockholder takes his stock subject to this restraining condition . . . That there is nothing inherently unconscionable in such a limitation upon the right of transfer is manifest from the very broad power exercised by organizers of companies under the English acts and in some of our states.''

So, in this case, the restriction upon the alienation of the shares of stock was inserted in the Standard Marketing Agreement which was signed by all members of the association, and the corporation came into existence with this inherent qualifying restraint. The agreement is not absolutely restrictive of sale or transfer, but merely imposes the condition that stock shall be sold only to members of the association. The restriction upon the sale and transfer of the stock is not unreasonable, in view of the large membership of the association and the market thus afforded. While the warehousing corporation was not organized under the Bingham Act, it is a necessary part of the machinery with which the association is endeavoring to carry out its co-operative marketing plan, and exists solely for the benefit of the members of the association. It is just as essential that the public policy of the state as declared by the Legislature, authorizing the limitation of stock ownership in co-operatives, be applied to the warehousing corporation as to the association itself. To hold otherwise would be to hold that the Legislature had done a futile thing. We are of the opinion, therefore, that the provision in the articles of incorporation and by-laws of the warehousing corporation restricting the sale and issuance of stock of the corporation to members of the association is valid, and that neither of the assignments by Carpenter passed to Dummit the legal title to the stock.

The attempted alienation of the stock, however, is not void by reason of any inherent vice in the transaction. The assignment is not tainted with fraud, nor is it essentially illegal. The sole purpose of the limitation on the ownership of the stock is to retain the control of the corporation in friendly hands. Dummit has parted with a valuable considertaion for the stock, and, Carpenter being unable to deliver it to him, Dummit, has as

between him and Carpenter, a lien upon the stock for the amount paid therefor. Where a written contract for the sale of land is rescinded, the purchaser, although he may never have been in the possession, is entitled to a lien for the purchase money paid. Bullitt v. Eastern Kentucky Land Co., 99 Ky. 324, 36 S. W. 16, 18 Ky. Law Rep. 230; Delano v. Saylor (Ky)., 113 S. W. 888; Elliott v. Walker, 145 Ky. 71, 140 S. W. 51. Ordinarily, there is no implied lien upon personal property in favor of one who has advanced money for it, without having either the title or possession. Allen v. Shortridge, 1 Duv. 34. This rule is always applied in the case of a common-law lien which is simply the right to retain possession until some obligation of the owner is satisfied, but the circumstances may be such that equity will raise a lien based upon general considerations of justice without agreement therefor between the parties and without title or possession in the lienholder. Such liens may result by implication from a duty resting on the owner of property which is the subject matter of the lien, and the right is completed by equity in pursuance of the maxim that that is deemed done that ought to be done. In 10 R. C. L. 351, it is said:

"There are, however, certain liens, purely equitable in character as distinguished from statutory or common law liens, which are cognizable only in a court of equity. Such a lien arises either from a written contract which shows an intention to charge some particular property with a debt or obligation, or is implied and declared by a court of equity out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings."

In 3 Pomeroy's Equity Jurisprudence (4th Ed.), section 1233, it is said:

"An equitable lien is not an estate or property in the thing itself nor a right to recover the thing— that is, a right which may be the basis of a possessory action; it is neither a jus ad rem nor a jus in re. It is simply a right of a special nature over the thing which constitutes a charge or incumbrance upon the thing, so that the very thing itself may be proceeded against in an equitable action, and either sold or

sequestered under a judicial decree, and its proceeds in the one case, or its rents and profits in the other, applied upon the demand of the creditor in whose favor the lien exists. It is the very essence of this condition that, while the lien continues the possession of the thing remains with the debtor or the person who holds the proprietary interest subject to the incumbrance.''

Also see section 1234, same volume.

In Kline v. Cofield, 159 Ky. 744, 169 S. W. 477, the defendant sold the plaintiff logs to be delivered by him, and the plaintiff advanced to the defendant $2,000 after having measured the logs in the woods, and, the defendant having failed to deliver the logs, it was held that the purchaser had an equitable lien for the advances.

In this case Carpenter attempted to sell his stock in the warehousing corporation to Dummit, and Dummit has paid him the purchase price. The certificates for the stock have never been issued, but are issuable at the direction of the appellant Burley Tobacco Growers' Cooperative Association. We conclude that, while the legal title to the stock did not pass to Dummit by the assignments, Dummit has a lien thereon for the amount paid by him for such stock, and the association, having notice of the lien, will not deliver the certificates to Carpenter until the lien has been satisfied.

It is conceded that the assignment by Carpenter of ''all proceeds including common stock'' represented by the participation certificates issued to him for his 1923 crop of tobacco was intended by the parties to carry his common stock, but it is insisted that it was not intended by the parties that the assignment by Carpenter of ''all proceeds'' of the 1925 crop should carry the common stock, and that neither assignment carried the dividends placed to his account prior to the presentation of the assignment to the association nor any part of the 1 per cent of the proceeds from the sale of the tobacco deducted for commercial purposes.

The word ''proceeds'' is not limited in its meaning to money. In Martin v. Buechel, 186 Ky. 786, 218 S. W. 278, the court adopted Bouvier's definition of ''proceeds'' as ''money or articles of value arising or obtained from the sale of property. The sum, amount, or value of goods sold and converted into money.'' 3 Bouv. Law Dict.

2730. In Phelps v. Harris, 101 U. S. 370, 25 L. Ed. 855, the court said:

> "The word 'proceeds' is one of equivocal import and of great generality. It does not necessarily mean money, its meaning in each case depending very much upon the connection in which it is employed and the subject matter to which it is applied."

Nor does the word "pay" necessarily refer to money. To "pay" means to discharge a debt in money, goods, or other thing of value. Galbraith v. Starks, 117 Ky. 918, 79 S. W. 1191, 25 Ky. Law Rep. 2090; Starr v. Board of Commissioners, 40 Ind. App. 7, 76 N. E. 1025, 79 N. E. 390; La Montague v. Bank of New York, 94 App. Div. 219, 88 N. Y. S. 21. The proceeds due Carpenter from the association out of the crop of tobacco included everything that was at that time, or may be at any future time, due him from the tobacco or from the sale thereof. The money derived from the sale of the tobacco constitutes the proceeds of the tobacco. No common stock of the warehousing corporation has been issued to Carpenter, but certain money which was part of the proceeds from the sale of his tobacco has been placed to his credit on the books of the association, and common stock of the warehousing corporation is to be issued in that amount and in lieu thereof. The money placed to his credit constituted part of the proceeds of his tobacco crop, and the common stock to be issued therefor is merely these proceeds in another form. The same is true of the unused portion of the 1 per cent deduction for commercial purposes. This deduction was made from the proceeds arising from the sale of Carpenter's tobacco and is a part of those proceeds. We conclude, therefore, that the term "all proceeds" included not only the net proceeds from the sale of the tobacco represented by the certificates and not heretofore paid as advances, but also the common stock and the unused portion of the 1 per cent commercial deduction. What has been said in regard to the assignment of the proceeds of the 1925 crop applies also to the assignment of the proceeds of the 1923 crop in which the words of assignment were even broader and more inclusive. As has been heretofore observed, Dummit, not being a member of the class to whom stock in the warehousing corporation may be sold or issued, acquired no title to the stock by reason of the assign-

ment but only a lien thereon for such sum paid to Carpenter as represented the purchase price of the stock.

It is also insisted that dividends or guaranteed earnings that have been credited to Carpenter do not pass by the assignment.

Out of the proceeds of the 1923 crop of tobacco, delivered by Carpenter to the association, $212.10 was deducted and placed to Carpenter's credit on the books of the association, for which common stock of the warehousing corporation was to be issued to him. The association used this sum along with similar deductions made from the proceeds of tobacco delivered by other members to retire preferred stock of the warehousing corporation and pay dividends on preferred stock outstanding during the preceding year and on common stock that had been credited as of June 30, 1923, to members in lieu of deductions that had been made from the proceeds of the 1922 crop.

The sum of $17.51 was credited to Carpenter as a dividend of 8 per cent on common stock of the par value of $218.91, which had been purchased for him by the association with deductions from the proceeds of his 1922 crop of tobacco. This $17.51 was not actually paid to Carpenter but was placed to his credit. It was not specifically a part of the $212.10 deducted from the proceeds of his 1923 crop but was a part of the fund created by like deductions made from the proceeds of the tobacco delivered by all of the members. This dividend would have been credited to him had he delivered no tobacco in 1923 and would have been taken from deductions made from the proceeds of tobacco delivered by other growers.

Out of the 1925 crop of tobacco, delivered by Carpenter to the association, $425.28 was deducted and placed to his credit, for which common stock of the warehousing corporation was to be issued to him. This sum was used for the same purpose as was the $212.10 deducted from the proceeds of his 1923 crop. $57.75 was credited to him as dividends on common stock that had been purchased for him by the association with deductions from the proceeds of tobacco delivered by him during the preceding years. This sum, like the $17.51 in controversy, was a part of the fund created by the deductions made from the proceeds of tobacco delivered by all of the members and was not a part of the $425.28 deducted from the proceeds of Carpenter's tobacco except

in so far as the latter sum was a part of the total fund created by the deductions from the proceeds of the tobacco delivered by all of the members.

It will thus be seen that the so-called dividends credited to Carpenter were not, in the final analysis, deductions from the proceeds of his tobacco. The total deductions made from the proceeds of his 1923 and 1925 crops of tobacco were $212.10 and $425.28, respectively, and for these deductions he is entitled to common stock of the warehousing corporation. The association used these sums to retire preferred stock and pay dividends on preferred and common stock of the warehousing corporation and Carpenter, being the owner of common stock, was credited with the dividends due him. So these dividends were not parts of the proceeds arising from the sale of Carpenter's tobacco. They do not pass under the assignment of his interest in the 1925 crop, nor under the first assignment of his interest in the 1923 crop. By the second assignment of his interest in the 1923 crop, he undertook to sell, assign and transfer to Dummit certain warehouse certificates, "including all common stock and all the rights, title and interest therein of the undersigned and all the rights and privileges connected therewith which has or may flow therefrom." This language is broad enough to pass title to all sums which, prior to the date of the assignment, had been credited to the assignor as dividends or earnings on the common stock assigned. The sums that had been so credited to Carpenter, and to which Dummit is entitled, are $16.96 credited on June 30, 1925, and a like sum credited on June 30, 1926, each being an 8 per cent dividend or earning on $212.10 of stock representing the deductions from the proceeds of Carpenter's 1923 crop of tobacco. These sums were due Carpenter from the association and could be assigned. The $16.96 credited on June 30, 1925, is a part of the sum of $34.48 credited on the same date and representing guaranteed earnings on prior deductions, and the $16.96 credited on June 30, 1926, is a part of the sum of $57.75 in controversy. The remaining portion of the latter sum represents guaranteed earnings on deductions made from the proceeds of the 1922 and 1924 crops of tobacco and, not being a part of the proceeds of the 1925 crop, does not pass under the assignment.

Had Dummit been a member of the association, and thus one of the class to whom the legal title to the stock could be transferred, it is clear that he would also be en-

titled to the sums to be credited to Carpenter on June 30, 1927, and thereafter, as dividends or earnings on the stock sought to be assigned. However, as we have concluded that Dummit did not acquire the legal title to the stock, but only a lien thereon for the amount paid therefor, it follows that he did not acquire any rights or privileges connected therewith which may flow therefrom subsequent to the date of the assignment.

The lower court properly adjudged that all rights in the 1 per cent commercial credit reserve passed under both assignments to the assignee, Dummit, but that no right or interest passed to him in the $17.51 placed to Carpenter's credit on June 30, 1924, since this amount was credited to him as earnings on deductions from other crops of tobacco than the 1923 and 1925 crops, and was not a part of the proceeds of either of those crops, and that no interest passed to him in the $57.75 in so far as that sum represents earnings credited to him on deductions from the 1922 and 1924 crops. He is entitled, however, to the guaranty of 8 per cent on the $212.10 of stock which was placed to Carpenter's credit on June 30, 1925, and June 30, 1926, amounting to $16.96 each year.

The judgment is therefore affirmed as to these items but in all other respects it is reversed, with directions to enter a judgment in conformity herewith.

The whole court sitting.